UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. 17-12625 |
| COPSYNC, INC. | SECTION "B" |
| DEBTOR | CHAPTER 11 |

*************************************************************************

H. KENNETH LEFOLDT, JR., TRUSTEE OF THE
COPSYNC, INC. LIQUIDATION TRUST

VERSUS                                                              ADV.P. NO. 19-1004

BRANDON-COPSYNC, LLC, BRANDON
FLANAGAN AND DONALD FLANAGAN

**MEMORANDUM OPINION**

This matter came before the court on July 20-23, 2020 as a trial on the complaint of H. Kenneth Lefoldt, Jr., in his capacity as the Trustee of the COPsync, Inc. Liquidation Trust (the "Trustee"), against defendants Brandon-COPsync, LLC ("BCS"), Brandon Flanagan, and Donald Flanagan. For the reasons set forth below, the court finds that the Trustee has proved his breach of contract claim and the turnover claim against the defendants, and the court awards damages in the amount of $155,184 jointly and severally against both Brandon and Donald Flanagan. The court also awards $32,500 against all defendants jointly and severally as reasonable attorney's fees for abuses of the discovery process.

I.     **Background Facts**

The debtor, COPsync, Inc., ("COPsync" or the "debtor") and BCS were parties to a distribution agreement that was entered into on June 2, 2010 and renewed or renegotiated several times thereafter. The debtor was founded in 2005, and it created a software for a service platform for law enforcement to share real-time information amongst counties, agencies and

1

departments. The software was sold and/or licensed under both the COPSYNC and COPSYNC911 trademark. The agreement between the debtor and BCS granted BCS a non-exclusive license to sell the software and related goods and services in a limited geographic area in the northeastern United States. The agreement was structured such that BCS collected all the fees from its sales and was then obligated to remit to the debtor a certain portion of the fees. This did not always happen as it should have. On September 29, 2017 when the debtor filed a petition for relief under Chapter 11 of the U.S. Bankruptcy Code[1], it was owed significant sums by BCS for the debtor's share of software sales that BCS failed to remit to the debtor. Further complicating this was the failure of both BCS and the debtor to adequately keep track of sales and invoiced amounts, so it was unclear to the debtor how much BCS actually owed the debtor.

Prior to the trial in this matter, on May 6, 2020, the court granted a judgment on the pleadings in favor of the Trustee against BCS "in the amount of $661,705.75 for the accounts receivable owed to Copsync, Inc. (the "debtor") as of December 18, 2017, plus interest at the federal rate from the date this adversary proceeding was filed." (R.Doc. 106). The court also rendered judgment for an additional $69,534.00, which represented the amount BCS "collected for the sale and/or license of the debtor's software after the debtor's bankruptcy filing." These numbers were arrived at by using the Trustee's calculations in the motion for judgment on the pleadings. The Trustee in his post-trial brief now asks the court to enter judgment against the Flanagans[2] in the amount of $386,760.00 plus an additional $117,932.69 in attorneys' fees and costs incurred by the Trustee in attempts to obtain discovery from the Flanagans. The Trustee states in his post-trial brief that the $69,534.00 awarded by the court against BCS in the

---

[1] 11 U.S.C. § 101 *et seq.*
[2] Donald Flanagan, as the only member of BCS, was the sole owner. His son, Brandon Flanagan, was sales manager and an officer of BCS.

judgment on the pleadings is duplicative of the $386,760.00 he now seeks against the Flanagans, but he argues that the court should award judgment of this amount against the Flanagans anyway.

## II. Legal Analysis

### a. Did the debtor's plan of reorganization properly retain causes of action against the Flanagans?

The Flanagans argue that the claims against them as individual defendants were not retained in the plan as required by *United Operating,* 540 F.3d 351 (5th Cir. 2008). Although *United Operating* and *SI Restructuring,* 714 F.3d 860 (5th Cir. 2013) both hold that post-confirmation causes of action belonging to the estate must be specifically identified and reserved in the plan, they do not require that individual defendants must be named. Here, the plan reserved "any and all rights, claims, causes and rights of action… related to the Brandon COPsync receivable." The court finds that this is broad enough to cover the claims the Trustee has brought against BCS and the individual defendants, because the claims against them are related to and arise out of the Brandon COPSync receivables, which were collected by the defendants, but not paid to the debtor. Further, *Texas Wyoming Drilling, Inc.,* 647 F.3d 547 (5th Cir. 2011) holds that the defendants need not be specifically named in the plan, citing to *Ice Cream Liquidation,* 319 B.R. 324 (Bankr.D.Conn. 2005).

### b. The Breach of Contract Claim

The distribution agreement was first entered into on June 2, 2010. It was amended several times.[3] The first amendment was entered into on September 30, 2012.[4] This first amendment set forth the process whereby BCS would sell the software, bill for it, and then remit 50% of the sale or renewal fee to COPsync. Although COPsync set up the customer account, it

---

[3] Trial Exhibit 114 contains the agreement and all amendments. The first agreement was between COPsync, Inc. and Brandon Associates, LLC. Brandon Associates, LLC was a precursor to BCS.
[4] This first amendment is between COPsync and BCS.

sent its invoices to BCS, which as then responsible for collecting the fee and paying COPsync its share of the revenue. The second amendment to the distribution agreement was entered into on January 15, 2014. Although there was not a lot of testimony at trial about this second amendment, it states that it is related to sales of a product called VidTac. The third amendment to the distribution agreement was dated August 3, 2015. This agreement included a, "Settlement Agreement and Mutual Release." The settlement agreement is between COPsync and BCS and is a settlement of disputes that the parties refer to as the Massachusetts Litigation. It provides releases for both parties from any and all claims, etc., arising prior to the effective date of the agreement, which is August 3, 2015. This also appears to be where problems with payment of the invoices became an issue because the third amendment contains a provision at paragraph 2.2(ii) that requires BCS to make monthly payments of $2,000 to pay down a list of invoices contained in Exhibit A to the third amendment. It also contains deadlines for payments of new invoices. Finally, a fourth amendment was entered into on November 1, 2016. The fourth amendment changed the percentages of the revenue sharing from a 50%-50% split between BCS and COPsync to a 60%-40% split with the 60% going to BCS. This change in the revenue split was contingent upon BCS making two payments of $50,000 each to COPsync by certain dates. The fourth amendment also provided that BCS was to commence making monthly payments of $8,000 to COPsync.

BCS made the first $50,000 payment on time. It paid $25,000 on the date the second payment was due, and then it paid the remainder a few months later.[5] When the last payment was made, BCS asked COPsync to confirm that receipt of the payment would, "satisfy in full the

---

[5] The fourth amendment stated the payments were due on November 10, 2016 and January 31, 2017. BCS paid $50,000 on November 10, 2016, $25,000 on January 31, 2017, $10,000 on March 7, 2017 and $15,000 on March 13, 2017.

4th Amendment solidifying the term extension and the revised revenue share." COPsync did confirm this, so the court finds that under the fourth amendment the revenue sharing agreement changed to a 60%-40% split in favor of BCS.[6] BCS made one of the monthly payments of $8,000, but it made no further monthly payments.[7] On June 2, 2017, COPsync sent a notice of default to BCS.[8] According to the Trustee, the distribution agreement terminated on June 15, 2017.[9]

The evidence in the record and the testimony of the witnesses established that despite these problems, the parties continued to work together after the notice of default. They also discussed a potential merger. There were many emails back and forth discussing the possibility of a merger. The Trustee put on a witness, Jan Roe, who worked for COPsync at the time, and she testified that COPsync had no intention of merging with BCS. Rather, she testified that COPsync was using the merger discussion to try to get information about BCS's financial condition. The CEO of COPsync, Ron Bienvenu testified, however, that he considered the possibility of a merger with BCS to be a viable potential solution to COPsync's financial problems. He testified that he was brought in to try to restructure COPsync after its previous management had been removed. He further testified that there were hard feelings about BCS by many of the people who had been employed with the debtor before he became the CEO. As late as September and October of 2017, Brandon and Donald Flanagan were negotiating for a role in the ongoing computer software business of COPsync.[10]

---

[6] Trial Exhibit 12.
[7] The parties agreed that one $8,000 payment was made. It is not clear from the record when that payment was made.
[8] Trial Exhibit 38.
[9] The notice of default was not immediately received by BCS, so the Trustee asserts the agreement terminated on June 15, 2017.
[10] Trial Exhibit 84, an exchange of emails dating from September 27 to October 6, 2017. In these emails, Donald was inquiring about forming a new company to take over or merge with COPsync.

The defendants also put forth evidence and testimony to show that COPsync was experiencing significant problems of its own. In 2017, leading up to the bankruptcy filing,[11] COPsync had reduced staffing and experienced problems with supporting its software. The Trustee countered this with his own evidence showing that many of the problems that were brought to COPsync's attention, such as resetting customer passwords, was the responsibility of BCS under the agreement.

The court finds that BCS, through the Flanagans, and Ron Bienvenu of COPsync were discussing the possibility of a merger or other way of combining operations, and that the parties continued to work together to make sales of software after the notice of default.[12] The court also finds, however, that BCS did not make any payments to COPsync after the above-mentioned payments totaling $108,000 related to the fourth amendment to the distribution agreement. The court finds that as to the technical problems, COPsync failed to provide some of the support services it should have, but BCS also should have provided customers with services such as resetting passwords. The court finds that BCS was in breach of the contract for non-payment, but it also finds that COPsync shares some of the blame for the situation. Additionally, COPsync continued to set up service for the new customers BCS and/or the Flanagans brought in after the default notice was issued. Although there is plenty of blame assignable to both sides, the court finds that any blame falling on COPsync did not justify BCS or the Flanagans withholding COPsync's share of the revenue from sales.

The Trustee is entitled to recover the amount of fees collected that should have been paid to COPsync. The court has already awarded judgment to the Trustee against BCS in the total

---

[11] The voluntary petition for relief under Chapter 11 of the Bankruptcy Code was filed on September 29, 2017.
[12] Brandon Flanagan testified that the Flanagans were also considering creating a new entity for purposes of a merger.

amount of $731,239.75.  But, because BCS no longer exists and has no assets, that judgment may be worthless.  Thus, the Trustee further seeks to recover from the Flanagans individually.

### c. The Dissolution of BCS and related provisions of Massachusetts Law

BCS was dissolved by the Massachusetts Secretary of State on June 30, 2017. Massachusetts law has some very specific provisions regarding the dissolution of an LLC.  They are found in Massachusetts General Laws, Annotated, Chapter 156C, the Limited Liability Company Act.  Section 70 of the Act provides that when a company has failed for two years to comply with the laws requiring the filing of annual reports, the state secretary shall administratively dissolve the limited liability company.  Further M.G.L.A. 156C § 70(c) states: "A limited liability company administratively dissolved continues in existence, but shall not carry on any business except that necessary to wind up and liquidate its affairs."  Section 45 of Chapter 156C discusses business that choose to dissolve, rather than being dissolved by the secretary of state, but nonetheless proves instructive.  It states at subsection (b) of §70:

> Upon dissolution and notwithstanding the filing of a certificate of cancellation pursuant to section 14, a limited liability company may continue its existence but shall not carry on any business except as necessary to wind up its affairs or distribute its assets which may include, but shall not be limited to, prosecuting and defending suits, whether civil, criminal or administrative, gradually settling and closing the limited liability company's business, disposing of and conveying the limited liability company's property, discharging or making reasonable provision for the limited liability company's liabilities and distributing to members any remaining assets of the limited liability company, without affecting the liability of members and managers and without imposing liability on a liquidating trustee.

Additionally, Chapter 156D, which applies to business corporations generally rather than limited liability companies also discusses the concept of winding up.  It states at §14.05:

7

>Section 14.05. EFFECT OF DISSOLUTION
>(a) A dissolved corporation continues its corporate existence but may not carry on any business except such as is necessary in connection with winding up and liquidating its business and affairs, including:
>(1) collecting its assets;
>(2) disposing of its properties that will not be distributed in kind to its shareholders;
>(3) making adequate provision, by payment or otherwise, and after giving effect to the provisions of sections 14.06, 14.07 and 14.08, for all of the corporation's existing and reasonably foreseeable debts, liabilities, and obligations, whether or not liquidated, matured, asserted, or contingent;
>(4) distributing its remaining property among its shareholders according to their interests; and
>(5) doing every other act necessary to wind up and liquidate its business and affairs.

Both Brandon and Donald Flanagan testified that after June 30, 2017 they performed activities to wind up the company.[13] There was also testimony and evidence, however, that showed BCS was continuing to conduct business, such as taking out loans and making sales. Both Flanagans were involved in these activities. Further, both Brandon and Donald were discussing a possible merger of either BCS and COPsync or a new entity to be formed by them for purposes of merging with COPsync. Eventually, they formed In Force Technology, LLC to replace BCS, and transferred many of the BCS customers to this new entity.[14] The court finds that these are not winding up activities. Massachusetts law provides that where a limited liability company engages in activities other than winding up after the limited liability company has been dissolved, there is *ultra vires* liability. *Salvato v. DiSilva Transp. Co.,* 329 Mass. 305, 308, 108 N.E.2d 51, 53 (Mass. 1952) (carrying on of corporation's original business, except for purposes of winding it up would be *ultra vires*), *see also National Lumber Co. v. Fink,* 2018 WL 1414487

---

[13] Donald Flanagan testified that BCS was "out of business" by November 2017.
[14] In Force Technology developed a similar product to the debtor's software platform and there has been litigation related to this in Massachusetts brought by Kologic, the company that purchased COPsync's assets in the main bankruptcy case against In Force and the Flanagans.

at *2, 93 Mass.App.Ct. 1103 (2018) (post dissolution acts that are not "winding up" activity are *ultra vires*). Here, Donald Flanagan was the sole member of BCS, and Brandon Flanagan was an officer of BCS and was very active in making sales and contacting customers of BCS and COPsync. The both engaged in many activities after June 30, 2017 that were not "winding up" activities. Specifically, the court finds that sales activities are not winding up activities within the meaning of the Massachusetts statutes referenced above. Rather, sales of COPsync software are the business for which BCS was organized. Thus, making these sales after BCS was dissolved was an *ultra vires* act, and the court finds that the liability associated with the non-payment of COPsync's share of these sales is attributable to Donald Flanagan as the sole member of BCS and Brandon Flanagan as a manager or officer of BCS.

As stated above, the Trustee proposes that the court enter judgment against the Flanagans in the amount of $386,760.00. The Trustee arrives at this amount by adding the invoices and received payments report of BCS found at Trial Exhibit 110 and adding together all the transactions that occurred after June 30, 2017. The court has also added these sums, but it arrives at $387,960.00, so the court will use this figure as a starting point.[15] The Trustee argues that all payments collected by BCS after June 30, 2017 are owed, but the fourth amendment, which was in effect as of March 13, 2017, provided that BCS was required to pay to COPsync only 40% of its revenues from sales. This became effective on the date that BCS made the final $15,000 payment to COPsync. BCS received confirmation via email from COPsync's corporate counsel, Maria Fernandez, that the March 13, 2017 payment "will satisfy in full the 4th Amendment solidifying the term extension and the revised revenue share." [16] Forty percent of

---

[15] The court found a transaction in the report that the Trustee had not counted in the amount of $1,200 that was paid on 10/19/17 by Bath, NH School.
[16] Trial Exhibit 12.

9

$387,960 is $155,184, and the court finds that this is the amount owed to COPsync from revenues collected after June 30, 2017.

### d. The Turnover of Estate Property Claim

The Trustee also pleads a claim under §542(a) of the Bankruptcy Code, which provides:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Section 541 of the Bankruptcy Code provides that a debtor's estate is comprised of "all legal or equitable interests of the debtor as of the commencement of the case." Here, the money that BCS failed to pay to the debtor constituted property of the estate.

The Trustee seeks turnover of the funds received by BCS after June 30, 2017 from both Brandon and Donald Flanagan. It is clear from the evidence presented at trial and discussed in the previous sections, that both Flanagans were in control of and in possession of those funds: Brandon as an officer/manager of BCS, and Donald as its sole member. Additionally, the Trustee showed through Trial Exhibit 136 that many thousands of dollars were transferred from the BCS bank account to Brandon Flanagan's personal bank account during the time period in question.

The court finds that both Brandon and Donald Flanagan exercised control over property of the estate in the amount of $155,184. It further finds that they shall turn over that property to the Trustee.

### e. The Willful Stay Violation Claim

The Trustee makes an argument that by failing to remit the funds to the debtor after the Chapter 11 petition was filed, BCS engaged in a willful violation of the automatic stay. The

10

court has already ruled in favor of the Trustee on his other counts, so the court need not reach this argument.

### f. The Objection to Brandon-COPsync's proof of claim

The Trustee argues that BCS lacked the ability to file a proof of claim as a result of the dissolution. But Massachusetts law is clear, a dissolved limited liability company does not cease to exist, it just may not carry on any business except as necessary to wind up its affairs or distribute its assets.[17] Collecting money owed to the dissolved LLC constitutes a winding up activity. Because the proof of claim and the counterclaims of BCS are one in the same, the court will discuss them below.

### g. BCS's counterclaims[18]

In Demonstrative Exhibit 21, BCS lists six categories for which it makes claims against COPsync: 2017 Lost Revenue, A/R Price Corrections, 2017 Revenue Share Correction, Unpaid Royalties, Damage to Business Reputation, and SBA Loan Liability. First, BCS claims as part of its proof of claim that it lost $444,293.84 in revenue in 2017 due to the problems with the COPsync products. BCS argues that but/for COPsync's inadequacies and poor performance, it would have realized $444,293.84 in additional revenue. Because previous customers cancelled their subscriptions due to unhappiness with the product, BCS was not able to earn those renewal fees.

The Trustee showed that $197,897.84 of that was for accounts lost before the 3rd Amended Agreement was signed, and it therefore cannot be claimed as part of the damages.[19] This leads to a maximum lost revenue claim of $246,396 by the court's calculation. The court

---

[17] *National Lumber Co. v. Fink*, 93 Mass.App.Ct. 1103 (2018)
[18] Neither of the Flanagans made counterclaims against COPsync.
[19] The third amended agreement contained a settlement agreement releasing all parties from any claims pre-dating August 3, 2015.

does not find that BCS proved its claim of lost revenues, because it is clear from the record that BCS was able to make plenty of sales right up until and after the debtor's Chapter 11 filing. Further the defendants did not make a showing that they lost this amount in revenue during 2017.

The A/R price correction claim in the amount of $216,000.00 is found in Trial Exhibit 21. This contains an email from BCS to COPsync along with a spreadsheet prepared by BCS listing all the accounts receivable and BCS's corrections to those accounts. BCS contends that COPsync was listing some of the accounts at prices different than what BCS was charging and customers were paying. At various points, some customers were given discounts or reduced prices, but there does not seem to be a consistent way in which these discounts were given.

The spreadsheet is confusing and does not necessarily correspond to the BCS invoices listed in Trial Exhibit 110. For example, on the last page of the spreadsheet that is part of Exhibit 21 there are letter codes. D states: "Duplicate billing for Lebanon (6 lines apart) – systemic QB error? Inv 11677 appears twice in the aging." When the court goes to the two entries with the letter D both dated 12/31/2016 on the spreadsheet at p. 10, the first states an amount of $3,960, an open balance of $3,960, adjusted pricing of $2,760, and partial payments/adjusted revenue share of $2,760. The next entry, a few lines down states an amount of $6,660, an open balance of $6,660, adjusted pricing of zero, and partial payments/adjusted revenue share of zero. Exhibit 110 has entries under Lebanon, and it does not show the amounts that are referenced in the spreadsheet. No entries correspond to the $2,760 amount that BCS claims was actually received, rather the invoice list shows payments made in other amounts. On the other hand, there is also no payment for $6,660 as claimed by COPsync, so it would seem that part of the spreadsheet is correct. The court was unable to locate other entries referenced in the spreadsheet in the BCS invoices. The defendants did not provide the court with any sort of

detailed explanation of how the debtor misapplied the accounts receivables other than the report attached to the email in Exhibit 21. The court cannot ascertain that the adjustments in Exhibit 21 are correct from the exhibits. The defendants bear the burden of proof on their counterclaim, and the court finds that they did not carry that burden.

It is not clear what the defendants mean by 2017 Revenue Share Correction. Apparently, it has something to do with the fourth amended agreement and the difference between the 50%-50% revenue share and the 60%-40% revenue share agreed to in the amendment. The amount is listed as unknown, but in their post-trial brief, the defendants suggest that it is $20,000. But the court cannot tell how this was calculated or what documents might support this, so it declines to award this amount.

Damage to business reputation lists an unknown amount as damages, and the court can find no evidence that quantified that alleged damage. Finally, the defendants did not show how COPsync was responsible for the SBA loan liability of BCS or the Flanagans, so the court declines to accept that amount as a counterclaim.

### h. Attorney's Fees/Sanctions for Failure to Comply with Discovery Requests

The Trustee seeks an award of $117,932.69 in attorneys' fees and costs incurred by the Trustee in attempts to obtain discovery from BCS and the Flanagans. Throughout this matter the Trustee has had problems obtaining discovery from the defendants. Part of this was because the defendants avoided responding to discovery by switching attorneys several times. For example, in his motion for sanctions (R.Doc. 68) filed on January 27, 2020 the Trustee recites several times when the court gave the defendants discovery deadlines which they failed to meet. The Trustee also complains of other actions by the defendants related to discovery.

> Under FRCP 37, a party and its counsel "can only be held responsible for the reasonable expenses [including attorney's fees] caused by their failure to comply

with discovery". *Chapman & Cole & CCP, Ltd. v. Itel Container Int'l B.V.,* 865 F.2d 676, 687 (5th Cir.), *cert. denied,* 493 U.S. 872, 110 S.Ct. 201, 107 L.Ed.2d 155 (1989); *see Batson v. Neal Spelce Assocs., Inc.,* 765 F.2d 511, 516 (5th Cir.1985) (the "plain language of Rule 37 ... provides that only those expenses, including fees, caused by the failure to comply may be assessed against the noncomplying party"). Obviously, the fees incurred for the underlying discovery requests were not caused by any failure to comply. Discovery dispute or no, those fees would have been incurred.[20]

Looking at the request of the Trustee for attorney's fees, the court must determine a reasonable hourly rate. Although the court could not find a fee application for the Trustee's attorney in the record of either the adversary proceeding or the main case, and counsel did not provide a rate to the court, the court was able to examine other fee applications for work done by other attorneys for the debtor in the main bankruptcy case. Looking at the application for employment of another comparable New Orleans law firm in the bankruptcy case, the court approved as rates for special counsel $300 for an attorney with one year of experience less than counsel for the Trustee, and a rate of $350 for an attorney with one more year of experience than counsel for the Trustee.[21] Accordingly, the court finds that a rate of $325 per hour for counsel for the Trustee is appropriate for the purposes of calculating attorney's fees to be imposed for abuse of the discovery process. Dividing counsel's request for fees ($117,932) by the hourly rate of $325 leads the court to calculate that 363 hours were spent on discovery disputes.[22] That is far too many hours.

Counsel for the Trustee filed two separate motions for sanctions, plus a motion to compel, and a motion for adverse inference.[23] Counsel also appeared at the hearings for those

---

[20] *Tollett v. City of Kemah,* 285 F.3d 357, 368 (5th Cir. 2002).
[21] See (R.Doc. 3) in the main bankruptcy case 17-12625.
[22] The court realizes that these are probably not the actual numbers that counsel for the Trustee used, but in the absence of any numbers from the Trustee, the court needs to base its award of reasonable attorney's fees on something.
[23] (R.Doc. 54) filed on December 5, 2019 (motion for sanctions); (R.Doc. 68) filed on January 27, 2020 (motion for sanctions); (R.Doc. 100) filed on April 24, 2020 (motion to compel); and (R.Doc. 120) filed on July 3, 2020 (motion for an adverse inference of evidence, which was denied by the court).

four motions. If counsel spent 20 hours on each of the motions and the related hearings, that would be 80 hours. And assuming that counsel spent another 20 hours trying to work with the defendants to convince them to cooperate, there are 100 hours total for a fee of $32,500. Absent any evidence to support the claim that counsel for the Trustee spent over 300 hours (estimated) on only the failure to comply with discovery requests, and not for the requests themselves, the court declines to award anything more than $32,500 granted herein.

      **i. The Trustee's Supplemental Memorandum and the Defendants' Objection to the Supplemental Memorandum**

In preparing this opinion, the court requested by email that the Trustee file a supplemental memorandum only to show the court exactly where in the record the court could find support for the Trustee's claim of damages in the amount of $386,760.00.[24] The defendants objected on the basis that the court's request indicated that the Trustee failed to carry his burden of proving his damages. The court does not agree. The trial exhibits in this case were voluminous, and due to the undersigned judge's upcoming retirement, the court was under time pressure to finish this decision quickly. The supplemental memo points out for the court exactly which documents that were already in evidence that the Trustee used to calculate that number. No prejudice to the defendants was shown by the request for the supplemental memorandum as it does not contain any new argument or attempt to introduce any new evidence. Accordingly, the court overrules the defendants' objection to the supplemental filing that the court requested.

**III. Conclusion**

For the reasons stated in this Memorandum Opinion, the court finds in favor of the Trustee on the breach of contract claim and the turnover claim and awards $155,184 against

---

[24] Counsel for the defendants was copied on the email and informed the court that he objected to the court's request.

Donald Flanagan and Brandon Flanagan jointly and severally. The court also awards $32,500 against all defendants jointly and severally as reasonable attorney's fees for abuses of the discovery process. A separate judgment will be entered.

New Orleans, Louisiana, August 28, 2020.

                                                               _____
                                                               Jerry A. Brown
                                                               U.S. Bankruptcy Judge